# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HENRY BEVERLY,                )
                             )
    Plaintiff,              )
                             )    No. 17 C 5590
    v.                      )
                             )    Judge Sara L. Ellis
ABBOTT LABORATORIES, an Illinois   )
corporation, and VICTORIA LUO,     )
                             )
    Defendants.             )

## OPINION AND ORDER

Plaintiff Henry Beverly, an African American military veteran born in 1965, gradually saw his responsibilities at Defendant Abbott Laboratories ("Abbott") reduced, leading him to request an unprotected leave of absence. After Beverly requested a third extension of that leave, Abbott terminated his employment. Beverly then filed suit against Abbott and his direct supervisor, Victoria Luo. In his second amended complaint, he brings claims against Abbott for interference with and retaliation for the exercise of his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Counts I and II); race discrimination in violation of the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.*, and 42 U.S.C. § 1981 (Counts III and VI); age discrimination in violation of the IHRA (count IV); retaliation in violation of the IHRA and § 1981 (Counts V and VII); discrimination on the basis of past military service in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.* (Count IX); and breach of the covenant of good faith and fair dealing (Count VIII). Beverly also claims that Abbott and Luo committed defamation (Count X) and that Luo tortiously interfered with his continued employment at Abbott (Count

XI). Abbott and Luo have moved for summary judgment on all of Beverly's claims, and Beverly has moved for summary judgment solely on the tortious interference claim.

The Court grants in part and denies in part Abbott and Luo's motion and denies Beverly's motion. Considering his discrimination claims together, Beverly has not established a genuine issue of fact with respect to his termination, but he may proceed on whether his race, age, or military service caused Abbott to materially reduce his responsibilities prior to his termination. Similarly, Beverly's retaliation claims with respect to his termination fail, but those connected to the reduction in responsibilities may proceed. Because a question of fact surrounds the timing of Abbott's termination decision and Beverly's stated intention to take FMLA leave, his FMLA claims must proceed to trial. Beverly's defamation claim also survives summary judgment because a question of fact exists as to whether Luo acted with actual malice in reporting that Beverly had a history of lying after his termination. But because he has not shown a dispute to overcome Luo's qualified privilege for actions leading up to his termination or that he had a reasonable expectancy of continued employment, the Court grants summary judgment for Luo on the tortious interference claim. Finally, Beverly's breach of contract claim fails because Abbott's actions in terminating his contract accorded with the parties' reasonable expectations.

## BACKGROUND[1]

### I. Beverly's Background and Position at Abbott

Beverly served in the United States Army from 1985 to 1997. He worked for Abbott from May to September 2002. Abbott rehired Beverly in February 2007 to a senior financial analyst position. In 2008, Beverly laterally transferred to a demand analyst position for Abbott

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts submitted in connection with each motion for summary judgment, as well as any additional facts appropriately included in the parties' responses. All facts are taken in the light most favorable to the non-movant in each motion.

Nutrition International ("ANI").  Kevin Bowler supervised Beverly from 2008 to mid-2012.  In late 2012, Luo, a Chinese American born in 1970, and the Senior Finance Manager Demand and Sales Operations and Planning ("SO&P") for ANI, became Beverly's direct supervisor.  Luo's group aided ANI affiliates with monthly demand forecasts, published these reports, coordinated monthly SO&P meetings, and provided training to affiliates.  When Luo became the manager, Beverly took on some of Bowler's prior duties and handled any duties for which Luo did not have the certification or training.  Jeff Young, a commercial controller for Abbott, instructed Beverly to train Luo.  Pleased with Beverly's work, Young issued Beverly a monetary Abbott Excellence Award.  Luo also enlarged Beverly's role to include more contact with demand managers, with Beverly spending about three to eight hours a week training these managers.  In 2012 and 2013, Luo tasked Beverly with preparing templates and programs to allow country representatives to report on their new sales.  Beverly also created new financial models, KPI reports, product initiative reports, and a pulse report.

## II.     Changes in Beverly's Role between 2013 and 2015

In 2013, Abbott split into two companies, Abbott and AbbVie.  Abbott eliminated the Global Pharmaceuticals Operations ("GPO") team, which handled systems work for Luo's group.  Luo's group hired Hamid Akhtar, a former GPO employee of Pakistani national origin born in 1975, to fill an IT/systems role.  About four to six months after Akhtar began working in Luo's department, Luo shifted some of Beverly's duties, including uploading annual forecasts and new sales transactions, and manipulating data and spreadsheets, to Akhtar.  Beverly trained Akhtar on how to perform these duties.  In 2014, Akhtar also became responsible for training individuals on systems.  Beverly retained responsibility for reporting-related training, and Luo

for process-related training.  Later in 2014, Luo reduced Beverly's role and his interaction with affiliates, placing him on a new SAP project.

By 2015, Beverly no longer prepared pulse reports, forecast roll-ups, key performance indicator reports, product index reports, or ad hoc reports, all reports he had prepared in the past. He testified that all that remained for him in 2015 was to prepare part of a PowerPoint presentation for a meeting and to answer ad hoc requests from affiliates.  This amounted to about one to two hours of work per week, including forty-five minutes to an hour each month on the PowerPoint presentation and about an hour per week on requests from Abbott affiliates.  Beverly also only worked from home on the phone approximately once a month.

Prior to 2013, Beverly regularly attended system and supply chain meetings.  This changed to sporadic attendance in 2013, with Beverly excluded from meetings regarding the deployment of the new enterprise resource planning system and supply chain meetings with the ANI finance team, which Luo, Akhtar, and Young attended.  Beverly no longer had the opportunity to attend desired training sessions, although, in 2014, Luo approved Beverly to attend the annual AvaMed conference, which dealt with healthcare information systems. Beverly also traveled to receive training in Mexico.  Over the same period of time, Akhtar attended an SAP advanced planner and optimizer training, as well as a Demand & Supply Management Course in Basel, Switzerland.  Akhtar took on overseas training responsibilities, with Beverly stepping in only when Akhtar could not make the trip.  Abbott instituted a travel freeze in 2014, meaning that all overseas travel for meetings and trainings ceased.

Beverly testified that, in early 2015, he had a cordial working relationship with Luo. Beverly recalled having lunch with Luo once after she became his supervisor.  He also testified that he only met with Luo and Akhtar approximately once a quarter.  At some point in 2014 or

2015, Beverly recalls helping Luo's daughter with a school project on military veterans at Luo's request. On another occasion, Luo asked Beverly to drive her family friends from downtown Chicago to Abbott's office. Bruce Tsai, who started at Abbott in August 2015 in Beverly's former role, testified he had lunch with Luo every few weeks and with both Luo and Akhtar about five or six times.

Beverly's base rate of pay in April 2012 was $94,820.74. This increased to $97,902.41 in April 2013 and $100,839.48 in March 2014. Abbott never disciplined Beverly or placed him on a performance improvement plan, with Beverly instead receiving various letters of recognition and awards during his employment. Luo was impressed with Beverly, even before she became his manager. She knew of positive feedback Beverly had received from Steve Brodner, a manager on the Business Excellence team, who told Luo that Beverly was the "best tester we have." Doc. 68 ¶ 9. In his 2012, 2013, and 2014 performance reviews, Luo gave Beverly an achieved expectations rating. Luo testified that she did not include in his performance reviews that he sometimes failed to provide deliverables as promised because she did not want to negatively impact his chances for other opportunities at Abbott.

### III.     Beverly's Leave of Absence and Termination

Abbott has a personal leave of absence ("PLOA") policy that "provide[s] Abbott with a means to allow employees in good standing to be reinstated with past service credit . . . if they need to suspend active employment status." Doc. 62 ¶ 10. Employees must provide requests for a PLOA in writing to Abbott's leave vendor and include an estimate of the duration and purpose of the leave. Abbott retains the discretion to grant or deny the leave based on operational needs and the employee's performance. A PLOA may last between four continuous work weeks and six months, with extensions allowed only for a total of six months of leave. Abbott does not

guarantee reinstatement from a PLOA. Instead, the PLOA policy states that, "[i]f an employee's position is no longer available and if an employee is qualified and selected for an open position, the employee will be reinstated and the employment date (start date) is adjusted if the PLOA exceeded three (3) calendar months." *Id.* ¶ 70. "If an employee obtains full-time employment while on a PLOA, the leave will be canceled and termination will be automatic." *Id.* ¶ 14. The PLOA policy does not limit or prohibit Abbott's ability to terminate the employment of an at-will employee. Abbott's termination policy also provides that nothing in that policy limits Abbott's ability to terminate an at-will employee at any time without restriction. Beverly understood the contours of the PLOA policy.

In February 2015, Beverly applied for a job with the Clerk of the Circuit Court of Cook County. He began his orientation and probationary period with the Clerk's Office on March 9, 2015, at a salary of $100,183. His position was a full-time position, although he testified he initially only worked part-time. Beverly remains employed by the Clerk's Office. Beverly never told Abbott about his employment with the Clerk's Office while employed by Abbott. At the time he applied, Beverly saw the position as one that could provide him with employment security if Abbott terminated his employment.

After obtaining the Clerk's Office position, on March 16, 2015, Beverly requested a PLOA from Abbott to begin on March 20, with an anticipated return date of May 25. In connection with requesting the PLOA, he told Luo that he believed his role had essentially been eliminated, leaving him without any tasks or duties. Luo granted Beverly's request on March 20, but she told Beverly that, because of the duration of his leave, Abbott may have to search for a backup to cover his responsibilities during his absence. At the time, Luo's group was preparing for a system switch in August 2015. At the beginning of Beverly's leave, Luo and Akhtar

covered Beverly's job responsibilities. Beverly also periodically checked in, responding to work emails in March, April, and June 2015. He communicated with Luo every few weeks, met with her in person when he went into the office, and asked Luo to keep him updated on the group's projects.

On May 18, after a discussion with Luo in which Luo represented that everything was going well and Beverly's work was covered, Beverly emailed Luo and Maggie Stinson, an integrated claims examiner with Matrix Absence Management, Abbott's third-party benefits administrator, to request an extension of his PLOA through June 29. Luo approved the extension the next day. At the same time, Luo, with the aid of Abbott's human resources department, created a requisition for Beverly's position and posted it on May 22. Luo never informed Beverly she had posted his job internally, although Beverly testified he reviewed open positions at Abbott while on leave.

On June 24, Beverly sought a second extension of his PLOA, this time until July 31, meaning he would return to work on August 3. He indicated that a family member died in a boating accident off the Panama coast, requiring him to travel to Panama.[2] Luo approved Beverly's request for another extension of his leave on June 29. Meanwhile, on July 13, Abbott offered Beverly's demand analyst position to Bruce Tsai, a Taiwanese American born in 1969 who had previously worked at AbbVie. Tsai accepted the position either that day or on July 21, and he signed his employment agreement with Abbott on July 27. Luo introduced Tsai as Beverly's replacement in an email to ANI employees on August 4. Luo did not know Tsai before hiring him and did not contact any of his references. Tsai's 2014 performance assessment at AbbVie reflected an overall rating of 2 out of 5, meaning he met some but not all expectations

---

[2] Beverly never traveled to Panama, however, having learned that Panamanian officials suspected a homicide and so would not release the relative's body.

for results, and he also received a 2 rating for inconsistent demonstration of certain leadership attributes. Tsai's resume lists a number of programming skills, including: SAP F/I, SAP SD, SQL Server, Access, Excel WebFocus, WinShuttle, SharePoint, Cognos Reporting Portal, Business Object, Hyperion Financial Management/Essbase, SAS, and Oracle SQL Plus. But it also reflected that he had not worked with BOBJ, one of the computer programs used at Abbott, for five years, and Luo did not know if Tsai had worked with GSAT before his hire.

On the heels of Tsai's hiring, on July 26, Beverly sought a third extension of his PLOA through August 22. Beverly testified that, on or around July 27, he also told Luo of his intention to return to work to take FMLA leave. When Luo received the PLOA extension request, she contacted human resources and spoke with Kevin Mason and Dave McLoughlin about terminating Beverly's employment instead of granting the extension request. Luo explained to human resources that she was in the process of filling the position to address the work that had piled up due to Beverly's absence and the upcoming launch of a new system. Luo did not consult with Abbott's employee relations group.[3] Mason, the director of business human resources who is Caucasian and over the age of forty, supported the decision to terminate, which ultimately rested with Luo. Mason understood the facts to suggest that Beverly had no interest in returning to Abbott. On July 29, Mason and Luo called Beverly and informed him that they were denying his request for a PLOA extension, which meant that his employment terminated effective July 31.[4] Luo communicated the leave extension denial to Matrix, the leave vendor, after she notified Beverly. Beverly asked Mason and Luo how he should return the Abbott

---

[3] Abbott's termination policy indicates that the director of employee relations should review all termination recommendations, but it also includes a disclaimer that nothing in the policy prevents or limits Abbott and its employees from terminating an at-will employee without restriction.

[4] While on his PLOA, Beverly did not apply for any jobs at Abbott, claiming Abbott had not posted any jobs during that time.

property he had, including a laptop, tool bag, business cards, an ID, and a printer. Mason indicated he could return it when he had a chance, understanding that Beverly was not in town. Beverly retains that property to this day, claiming that he never received any other response to how to return the property.

After informing Beverly of his termination, Luo called Global Security, the Abbott department that investigates safety and security concerns raised by Abbott and its employees, to discuss the deactivation of Beverly's work badge and Beverly's access to the Abbott worksite. Global Security prepared a report of this conversation, which other Abbott employees, including those in the employee relations and global security departments and the Office of Ethics Compliance, could access. Kay Umscheid, a Global Security employee, testified that Luo told Global Security that Beverly had a history of lying and could be a security threat because of his military background. Luo did not identify any specific worrisome statements that Beverly had made, but she stated she did not want personal contact with him and did not feel comfortable. Umscheid deactivated Beverly's badge and provided Luo with safety and security recommendations. But Luo did not take any of these recommended precautions, instead testifying that she did not know what she could do for protection. Luo denies stating that Beverly could be a threat because of his military background. She also denies that Beverly lied to her but testified that she formed the impression that he did not tell the truth based on her interactions with him. Luo did not record any instances of lying in Beverly's performance reviews.

## IV. Beverly's 2012 Lawsuit against Abbott

Beverly and his wife, Martina, who previously worked for Abbott, filed a federal lawsuit against Abbott in April 2012. The court granted summary judgment for Abbott with respect to

Beverly's discrimination and retaliation claims in March 2014, but the court also ordered that Beverly participate in settlement discussions alongside his wife. Luo did not know of the resolution of Beverly's lawsuit at any time during his employment with Abbott. Mason could not recall if he knew of Beverly's prior lawsuit at any time leading up to Beverly's termination. But Beverly recalls that, in March 2014, on the day the court dismissed his claims against Abbott in the 2012 lawsuit, Young walked by Beverly's desk and "dance[d] in an upbeat manner, smiling and moving around in the space next to [Beverly's] desk." Doc. 77-1 ¶ 5. At that time, Young was Luo's direct supervisor, but he had not worked with Beverly since April 2013.

Beverly recalls that, in 2014 or 2015, Luo asked him to help his daughter with a school project she was doing on military veterans and, on one occasion, to pick her family friends up from downtown Chicago and drive them to Abbott's offices.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v.*

*Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light

most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of*

*Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002).

Therefore, when considering Beverly's motion for summary judgment, the Court views all

evidence in the light most favorable to Luo, and when considering Abbott and Luo's motion for

summary judgment, the Court views all evidence in the light most favorable to Beverly. *Id.*

## ANALYSIS

### I.     Race, Age, and Military Discrimination Claims

Beverly brings claims for race discrimination in violation of § 1981 and race and age

discrimination in violation of the IHRA.[5]  He also complains that Abbott discriminated against

him based on his military service in violation of USERRA.[6]  Courts previously spoke of

proceeding under an indirect or direct method to establish discrimination, but the Seventh Circuit

has instructed that instead of using such tests, the Court should consider the evidence "as a

whole" to determine whether it "would permit a reasonable factfinder to conclude that the

plaintiff's [race, age, or military service] caused the [adverse employment action]." *Ortiz v.*

---

[5] The Court uses the same framework for these claims and so analyzes them together. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that the same framework applies to Title VII and IHRA claims); *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016) (analyzing Title VII and § 1981 claims under the same framework); *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687, 131 Ill. 2d 172, 137 Ill. Dec. 31 (1989) (holding it appropriate to analyze age discrimination claims under the IHRA in accordance with the framework for claims under the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*).

[6] To establish a USERRA violation, a plaintiff must show he was subjected to an adverse employment action and his military service was a motivating factor in the employer taking that action, a standard "very similar to Title VII." *Staub v. Proctor Hosp.*, 562 U.S. 411, 416–17, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011).  The Court therefore considers the USERRA claim in conjunction with the race and age discrimination claims.

*Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court must determine "whether a reasonable factfinder could 'conclude that [Beverly's] proscribed factor caused the [adverse employment action].'" *Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1216 (N.D. Ill. 2017) (quoting *Ortiz*, 834 F.3d at 765). *Ortiz* does not preclude the Court from considering Beverly's claims under the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). But because the parties only pay lip-service to *McDonnell Douglas* and instead focus on the cumulative evidence going to causation, the Court does not engage in an analysis under *McDonnell Douglas*. Abbott challenges both whether Beverly's allegations of materially reduced responsibilities amount to an adverse employment action, acknowledging that his termination does, and whether Beverly can establish causation.

### A.      Adverse Employment Actions

A materially adverse employment action is an action that involves "a significant change in employment status," *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)), and is "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Adverse employment actions generally fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or

conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–454 (7th Cir. 2011).

Beverly alleges that, beginning sometime in 2013, Luo materially altered his job responsibilities and excluded him from meetings and trainings, leaving him with at most one to two hours of work per week. He claims that this could rise to the level of a constructive discharge because Luo stripped him of all meaningful work but still required him to report to work with nothing to do. But a constructive discharge requires a showing that Abbott forced Beverly to resign "because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). A plaintiff can show constructive discharge where he experienced discriminatory harassment that caused "working conditions even more egregious than that required for a hostile work environment claim" or where an employer's actions communicate the plaintiff's imminent termination. *Id.* Beverly does not point to evidence in the record rising to these levels. Although he testified he feared termination when he requested his PLOA, nothing suggests that Abbott intended to take such action around that time so as to make his termination "an imminent and inevitable event." *Id.* at 680 (collecting cases).

But Beverly need not establish a constructive discharge for Abbott's actions in decreasing his job responsibilities to amount to an adverse employment action. *See Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (adverse employment actions include "nominally lateral transfer[s] with no change in financial terms [that] significantly reduce[ ] the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted," as well as job changes that injure the employee's career but do not involve transfers). Although Abbott

parses each alleged instance of Beverly's changed work environment to suggest that the reduction in Beverly's job duties and training and travel opportunities cannot amount to adverse employment actions, the Court agrees with Beverly that he has at least demonstrated a question of fact as to whether, taken together, they amount to a materially adverse action. A reasonable juror could conclude that Luo's taking away of Beverly's job responsibilities and shifting them to Akhtar, which essentially left Beverly with nothing to do and no clear path for further advancement, suggests a material change in Beverly's position that could cause Beverly's skills to atrophy and diminish his career prospects. *See Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (reducing employee's job responsibilities so as to "leav[e] her with nothing to do but read a good book . . . would be adverse for all but those completely devoid of ambition or the need to be challenged"); *Parrett v. City of Connersville, Ind.*, 737 F.2d 690, 694 (7th Cir. 1984) ("Enforced idleness was not only a humiliating counterpoint to his years as detective chief but would if prolonged have depreciated his professional skills to the point where it would have been difficult for him to work his way back, in Connersville or elsewhere, to a responsible position."). Therefore, the Court proceeds to analyze whether evidence exists to suggest that Beverly's race, age, or military service caused the reduction in Beverly's responsibilities and his termination.

### B. Causation

Slight differences exist in the causation analysis for Beverly's claims. Specifically, Beverly must establish but-for causation for his IHRA age and § 1981 race discrimination claims.[7] *See Smith v. Wilson*, 705 F.3d 674, 679–80 (7th Cir. 2013) (§ 1981 claim); *Zaderaka*,

---

[7] A number of courts do not distinguish the causation requirement for Title VII and § 1981 claims. But the Seventh Circuit has indicated such a distinction exists, with § 1981 claims requiring but-for causation because "[m]ixed-motive theories of liability are always improper in suits brought under statutes without language comparable to the Civil Rights Act's authorization of claims that an improper consideration was *'a motivating factor'* for the contested action." *Serafinn v. Local 722, Int'l Bhd. of Teamsters,*

545 N.E.2d at 687 (IHRA age discrimination claim). For his USERRA and IHRA race discrimination claims, however, he need only demonstrate that his military service and race were motivating factors for the adverse action. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 284 (7th Cir. 2015) (USERRA claim); *Zaderaka*, 545 N.E.2d at 687 (IHRA race discrimination claim). The parties do not address the different causation standards for Beverly's claims, treating them all as allowing for mixed motives, and so the Court addresses them in the same way for summary judgment purposes.

Abbott argues that Beverly has no evidence to demonstrate that his race, age, or military service caused the adverse actions. Beverly may demonstrate causation through evidence of, for example, comments or animus toward the protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for the adverse employment action. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

### 1. Termination

With respect to Beverly's termination, the parties mainly focus the causation analysis on whether Abbott offered a pretextual reason for Beverly's termination. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Beverly can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' his termination, or indirectly by showing that [Abbott's] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *Duncan v. Fleetwood Motor Homes*

---

*Chauffeurs, Warehousemen & Helpers of Am.*, 597 F.3d 908, 915 (7th Cir. 2010); *see also Smith*, 705 F.3d at 680 (refusing to import "motivating factor" standard from Title VII claims into § 1981 claims).

*of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Abbott claims that it terminated Beverly after he requested a further extension of his PLOA because Abbott hired a replacement to cover Beverly's job duties and so Beverly's position no longer remained available. Beverly knew that Luo may seek to replace him during his leave, yet he continued to seek extensions despite this possibility. And he knowingly took unprotected leave, understanding that "[r]einstatement from a PLOA is not guaranteed" and that his position may not be available upon the conclusion of his PLOA, meaning Abbott would reinstate him only if he obtained another position at Abbott. Doc. 64-2 at 2–3. Thus, because the PLOA policy provided only for unprotected leave, Beverly cannot complain that Abbott terminated him based on its decision to hire someone in his place while he remained on PLOA.

Beverly nonetheless claims that Abbott is lying because Abbott did not follow its PLOA procedures and instead, set him up for termination. He argues that, to the extent Luo could not handle Beverly's job duties during his PLOA, she should have refused the initial leave request and all additional extension requests and instead told Beverly that Abbott needed him to remain an active employee. Beverly claims that, had Luo made clear to him the need for his help at work, he would have gladly returned to Abbott from his PLOA. This counterfactual appears unlikely given the fact that Beverly had secured a job with the Cook County Clerk's Office and failed to inform Abbott of that new position. But the Court need not delve into this argument because it would require the Court to act as a "super-personnel department" to "second-guess[ ] [Abbott's] business judgments" in the face of evidence that Beverly took unprotected leave, the PLOA policy did not guarantee reinstatement, and Beverly knew his job could be filled while he

remained on leave, which would effectively terminate his employment unless he found another position at Abbott. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair."). And while one could argue that Beverly was more qualified than Tsai, their relative qualifications do not affect the honesty of Abbott's explanation that it terminated Beverly because, at the time of his request for a third extension of his PLOA, his position no longer remained available. *See Seymour-Reed v. Forest Pres. Dist. of DuPage County*, 752 F. App'x 331, 335 (7th Cir. 2018) ("[A] pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness.").

With respect to his race and age discrimination claims, Beverly does not point to any specific comments about his race or age or other indications of animus based on race or age. But for his USERRA claim, he argues that Luo demonstrated animosity toward him as a service member by informing Global Security after his termination that he may be a threat because of his prior military background. Nothing in the record suggests that Luo's comment about Beverly's military service influenced her decision to terminate him, with the comment made instead in connection with a discussion related to Luo's concerns about her personal safety given Beverly's termination. Without anything more, such an isolated remark, unconnected to the termination decision, does not create a question of fact with respect to whether Beverly's military service caused his termination. *See Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (holding that, for a stray remark to establish discriminatory motivation, it must be "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the

adverse employment action"); *cf. Arroyo*, 805 F.3d at 285–86 (finding that emails of complaints about plaintiff's military service, followed by discussions about disciplining plaintiff for other reasons, could allow the inference that her punishment for other minor infractions "was actually motivated by her supervisors' long-standing frustration about her frequent absences").

Finally, Beverly argues that a question exists as to causation because Akhtar and Tsai serve as similarly situated employees whom Abbott did not terminate. But neither can serve as a comparator for Beverly's termination claims because neither engaged in the same relevant conduct—taking a PLOA.[8] *See Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (similarly situated employees are typically those who "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)); *Stroup v. Clark*, No. 99 C 50029, 2001 WL 114404, at *4, 6 (N.D. Ill. Feb. 2, 2001) (plaintiff failed to produce comparator for purposes of discriminatory termination claim where she did not produce evidence of similarly situated employees placed on inactive duty but not discharged or who were considered to be on inactive duty and then allowed to return to work). Without any evidence of discriminatory animus contributing to Beverly's termination, a reasonable jury could not find that Abbott terminated Beverly based on his race, age, or military service.

---

[8] In age discrimination termination cases, a plaintiff can also point to evidence that the employer replaced him with a substantially younger employee where the plaintiff was meeting the employer's legitimate expectations. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600–01 (7th Cir. 2010). In this case, Tsai does not qualify as a "substantially younger" employee because he was only four years younger than Beverly at the time of Beverly's termination. *See Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740 (7th Cir. 2010) ("[I]f an employee who is in the class protected by the ADEA is replaced by someone who is not 'substantially younger' (*i.e.,* ten years or so), no inference of age discrimination is generally appropriate."); *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998) ("[A] seven-year age difference is a presumptively insubstantial gap.").

### 2.    Reduction in Responsibilities

The parties focus less on the causation aspect of Beverly's discrimination claims based on the reduction in his responsibilities, likely because Abbott argued the reduction did not amount to an adverse employment action. Indeed, the Court does not have before it any argument concerning whether Abbott had legitimate, non-discriminatory reasons for significantly reducing Beverly's responsibilities and involvement in his department's work.[9] With respect to race and age discrimination, Beverly again does not identify any race- or age-based comments or animus. The Court's earlier analysis of Luo's one comment regarding his military status applies equally here, particularly where Luo made the comment well after any reduction in Beverly's responsibilities, which Beverly claims began in 2013.

What remains as evidence of causation is Beverly's contention that Abbott purportedly treated Akhtar and Tsai more favorably. Neither Akhtar or Tsai are African American or service members. Akhtar was born in 1975, Tsai in 1969, and Beverly in 1965.[10] Luo supervised all three individuals, who had or shared similar responsibilities. Akhtar did not hold the same role as Beverly, but he assumed many of Beverly's duties. Although Tsai began working at Abbott after Beverly's PLOA and termination, it appears he performed similar duties, with Luo reassigning some of the duties she had taken away from Beverly to Tsai.[11] Nothing in the record

---

[9] Abbott does argue that Beverly's complaints about having limitations placed on his foreign travel are belied by the fact that Abbott instituted a travel freeze in 2014. Abbott, however, does not provide any reason for why the foreign training opportunities in 2013 went to Akhtar first, with Beverly stepping in only when Akhtar could not perform the trainings.

[10] Because Tsai does not fall outside the protected class for age discrimination claims and is not "substantially younger" than Beverly, only Akhtar serves as a potential comparator for purposes of the age discrimination claim. *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453–54 (7th Cir. 2009) (comparator for purposes of age discrimination claim is someone under forty or, for those proposed comparators over forty, where the age difference is ten years or more).

[11] Abbott argues that Tsai does not qualify as a comparator because, after he started work, Luo's department was scheduled to undergo a system change, suggesting that the work environment changed.

suggests that Abbott held Akhtar or Tsai to different standards than Beverly.  Beverly argues

that, despite all other things being relatively equal, Abbott treated Akhtar and Tsai more

favorably because neither had their workload or responsibilities materially diminished and they

both received more personal attention from Luo.  Abbott's only reply is that Beverly cannot

show that the transfer of duties from Beverly to Akhtar (or the transfer of some of these duties

back to Tsai) benefited either Akhtar or Tsai, but Abbott does not provide any citation suggesting

that Beverly need demonstrate such a benefit to rely on them as comparators.  Although the

record appears thin, at summary judgment it at least creates a question of fact as to whether

Abbott treated Akhtar and Tsai more favorably, maintaining or increasing their job

responsibilities while significantly decreasing Beverly's.  *See Filar v. Bd. of Educ. of the City of*

*Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("All things being equal, if an employer takes an

action against one employee in a protected class but not another outside that class, one can infer

discrimination.").  Because a reasonable juror could question Luo's different treatment of

Beverly as compared to Akhtar and Tsai, particularly in light of the fact that Abbott has not

proffered a legitimate, non-discriminatory reason for Luo's actions, Beverly's case amounts to

more than just a claim that discrimination occurred based on his membership in the protected

classes.  *Cf. Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) ("Simply being

a member of a protected class, without something more to link that status to the action in

question, is not enough to raise a reasonable inference of discriminatory animus.").  Therefore,

the Court cannot grant summary judgment for Abbott on Beverly's race, age, and USERRA

discrimination claims based on the reduction in his responsibilities between 2013 and 2015.

---

But Abbott had been working on the system change while Beverly remained employed, and nothing
suggests that the system change had an effect on the standards to which Abbott held Beverly and Tsai.
*Cf. Lim v. Trs. of Ind. Univ.*, 297 F.3d 575, 581 (7th Cir. 2002) (individuals were not similarly situated
where several years had lapsed since plaintiff was a candidate for tenure and the other individuals were
examined for tenure "under different (and more stringent) standards").

## II. FMLA Interference and Retaliation

The FMLA entitles an employee to twelve weeks of leave per twelve-month period for a serious health condition that renders him unable to perform his job. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009) (citing 29 U.S.C. § 2612(a)(1)(D) ). An employer may not interfere with or deny an employee's exercise of his right to this leave. 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, Beverly must prove that (1) he was eligible for FMLA protection, (2) the FMLA covers Abbott, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take FMLA leave, and (5) Abbott denied him FMLA benefits to which he was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015). With respect to FMLA retaliation, Beverly must prove (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018). Beverly appears to claim that Abbott interfered with his FMLA rights and retaliated against him by terminating him after he informed Luo on July 27, 2015, of his intent to return from his PLOA leave so as to take FMLA leave.

Abbott argues that Beverly cannot prevail on these claims because Abbott had filled Beverly's position and decided to terminate Beverly before he informed Luo of his intent to return to work in order to apply for FMLA leave. The Seventh Circuit has held that an employer cannot retaliate for or interfere with the use of FMLA leave where the employer decided to terminate the employee before learning of the FMLA request. *See, e.g.*, *id.* (collecting cases); *Guzman v. Brown County*, 884 F.3d 633, 639–40 (7th Cir. 2018). But the facts in the record create a question of fact as to when Abbott made the decision to terminate Beverly. Abbott contends that the undisputed facts establish that it made the decision on July 26, the day before

Beverly claims to have informed Luo of his intention to take FMLA leave.  But this misrepresents the parties' agreed statements and the underlying evidence, which indicate only that, at some point after Beverly made his request for an extension of his PLOA on July 26, a Sunday, Luo contacted Abbott's human resources division and, with its input, decided to terminate Beverly.  *See* Doc. 62 ¶¶ 55–56 ("Luo testified that after Beverly's third request for an extension of his PLOA on July 26, 2018 [sic], she contacted HR, and they decided to terminate Beverly's employment.").  Luo consulted with human resources after Beverly's leave request, which occurred after Abbott offered Tsai the job, meaning that a question also exists as to Abbott's alternative argument that the termination decision date can be traced back to Tsai's hiring date.  Although Beverly may face other proof issues with respect to his FMLA claims, because a dispute exists as to the only element Abbott challenged, the FMLA claims survive summary judgment and must be resolved at trial.

## III. Section 1981 and IHRA Retaliation

Beverly also raises retaliation claims under § 1981 and the IHRA based on his joining of and participation in his wife's lawsuit against Abbott, which Beverly and his wife filed in April 2012.  To succeed on these retaliation claims, Beverly must establish that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between his protected activity and the adverse action.  *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *see Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (applying the same standards for Title VII and § 1981 retaliation claims); *Zaderaka*, 545 N.E.2d at 687 (noting that courts use the same analytical framework to analyze Title VII and IHRA claims).  Retaliation claims require but-for causation, meaning "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of

the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013); *see Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (§ 1981 retaliation claims); *Holladay v. CME Grp.*, No. 11 cv 8226, 2014 WL 4358362, at *5 (N.D. Ill. Sept. 3, 2014) (IHRA retaliation claims).

Abbott argues that Beverly cannot succeed on his § 1981 and IHRA retaliation claims because he cannot show that his protected activity—participation in the 2012 lawsuit—caused the adverse actions he claims to have suffered—a material reduction in responsibilities and, ultimately, his termination. Beverly may establish a causal link through an admission of discriminatory animus or "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

With respect to suspicious timing, Beverly focuses on the timing of the dismissal of his lawsuit in March 2014 and Abbott's actions that followed instead of on the entirety of his participation in that lawsuit. He argues that a jury could find suspicious timing because, after the court dismissed his claims in the 2012 lawsuit in March 2014, Young danced at Beverly's desk and, soon thereafter, Luo increased her efforts to remove Beverly's job responsibilities and shift them to Akhtar. Although Young may have danced at Beverly's desk the day the court dismissed Beverly's claims, an action from which a juror could infer his knowledge of the court's disposal of his claims, Young did not work with Beverly as of April 2013, a year before the partial dismissal, and was not involved in the challenged decisions. And nothing in the record suggests that Luo knew of the partial dismissal of the lawsuit in March 2014 or at the time

of Beverly's termination in 2015,[12] or that Mason knew of the 2012 lawsuit at all. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("In order to establish retaliation . . . , the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory[.]"); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that [the supervisor] *could* or even *should* have known about [the employee's] complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory."). Without any evidence to create a question of fact as to the relevant decisionmakers' knowledge of the partial dismissal of the lawsuit, Beverly's attempt at relying on suspicious timing in connection with that dismissal fails.[13]

The evidence instead reflects that, in 2012 and early 2013, Luo treated Beverly positively, giving him greater responsibilities despite his participation in his wife's lawsuit. This initial positive treatment despite the initiation and ongoing nature of the lawsuit undermines an inference that Beverly's participation in the lawsuit led to the reduction in his responsibilities. *See Morrill v. Nielsen*, No. 17-cv-3419, 2018 WL 3141798, at *13 (N.D. Ill. June 27, 2018) (noting that no causal connection existed where supervisor participated in decision to promote plaintiff a month after allegedly protected conduct). At the same time, however, a jury could rely on the same comparator evidence discussed in connection with Beverly's discrimination claims to infer that Beverly's protected activity eventually caused the reduction in his

---

[12] Indeed, the only evidence concerning Luo's knowledge suggests that she believed the lawsuit remained pending throughout the relevant time period, with Beverly testifying that Luo wished him good luck with his lawsuit against Abbot when he applied for his PLOA.

[13] Even assuming Luo or Mason knew of the dismissal of the lawsuit, at least with respect to Beverly's termination, too much time passed between the partial dismissal and his termination to give rise to a suspicion of retaliation. *See LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 360–61 (7th Cir. 2019) (without additional evidence, ten months between the end of plaintiff's lawsuit and her termination was too long to suggest a causal nexus); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) ("This court has held a temporal connection of four months failed to establish a causal connection between a protected activity and an adverse action.").

responsibilities, where neither Akhtar nor Tsai engaged in similar protected activity but all else remained equal. Abbott does not address the comparator argument, which creates a genuine issue of fact as to whether Abbott retaliated against Beverly for his participation in the lawsuit by reducing his responsibilities between 2013 and 2015. The retaliation claims based on the reduction in his responsibilities must proceed to trial.

The same cannot be said for Beverly's termination, where the Court has already found that Akhtar and Tsai do not serve as comparators. Additionally, the Court's pretext analysis with respect to Beverly's discrimination claims based on his termination is equally applicable here, further undermining Beverly's attempt to create a genuine issue as to causation. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018) (adopting pretext analysis from discrimination claim for retaliation claim). Without any question of fact as to whether the lawsuit caused Beverly's termination, the Court grants summary judgment for Abbott with respect to Beverly's retaliation claims based on his termination.

## IV.    Defamation

Beverly claims that Abbott and Luo defamed him when Luo told Global Security that Beverly was a threat and had a history of lying. To prove defamation *per se*, Beverly must show that (1) Abbott and Luo made a false statement about Beverly, (2) Abbott and Luo made an unprivileged publication of that statement to a third party, and (3) damages resulted. *Seitz-Partridge v. Loyola Univ. of Chicago*, 987 N.E.2d 34, 41, 2013 IL App (1st) 113409, 369 Ill. Dec. 692 (2013). Defamatory statements are actionable *per se* without allegations of damages when they involve the imputation of an inability to perform the duties of office or employment or when they prejudice a party or suggest a lack of ability in his trade, profession, or business. *Van Horne v. Muller*, 705 N.E.2d 898, 903, 185 Ill. 2d 299, 235 Ill. Dec. 715 (1998).

Abbott and Luo argue that a qualified privilege protects them from Beverly's defamation claim. *See Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 842, 221 Ill. 2d 558, 304 Ill. Dec. 369 (2006) ("A defamatory statement is not actionable if it is privileged; this is a question of law."). Beverly does not meaningfully dispute that Luo enjoys a qualified privilege for statements she made to Global Security that involved safety and security concerns in the workplace.[14] *See Haywood v. Lucent Techs., Inc.*, 169 F. Supp. 2d 890, 916–17 (N.D. Ill. 2001) (finding qualified privilege protected communication to security staff about terminated employee where "Lucent, the security guards, and third party employees have a compelling interest—even a duty—in knowing whether Haywood was no longer employed by the company and no longer allowed on the premises"), *aff'd*, 323 F.3d 524 (7th Cir. 2003); *see also Ho v. Abbott Labs.*, No. 11 C 09257, 2014 WL 4627815, at *9 (N.D. Ill. Sept. 16, 2014) (in similar case alleging defamation with respect to statements made to Abbott Security after plaintiff's firing, noting that an employer "likely has 'a compelling interest to make sure terminated employees [are] no longer allowed on company premises'" (alteration in original) (quoting *Haywood*, 323 F.3d at 533)).

This does not end the Court's analysis, however, where Beverly argues that Luo loses the privilege because she acted with actual malice in making the statements about his history of lying to Global Security. To overcome the privilege, Beverly must show that Luo "either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness." *Kuwik*, 619 N.E.2d at 133. "[A]n abuse of a qualified

---

[14] Although Beverly claims that no compelling interest supported Luo's statements to Global Security, the record indicates that Luo had security concerns and turned to the proper department within Abbott to discuss her security concerns arising out of Beverly's termination. His argument as to Luo's good faith in making these statements goes to whether Luo abused the privilege, not whether the privilege exists. *See Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133–36, 156 Ill. 2d 16, 188 Ill. Dec. 765 (1993) (discussing the objective nature of the privilege inquiry and the subjective nature of the inquiry into abuse of that privilege).

privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material only to proper parties." *Id.* at 136.

Beverly argues that Luo's contradictory statements about her discussion with Global Security and prior evidence suggesting the falsity of her statements indicates that Luo abused the privilege. Although Luo represented to Global Security that Beverly had a history of lying, she did not record any such instances of lying in his performance reviews and, in her deposition, denied that Beverly ever lied to her. And while Luo testified that she had the general impression that Beverly had a history of not telling the truth, she could not provide any specific examples aside from his occasional failure to provide deliverables on the promised date. Luo testified that she would not have put such information into Beverly's performance review so as not to negatively impact any attempts at advancement within Abbott. Luo also told Global Security that she had concerns for her personal safety but then failed to take any further action after making the report to Global Security, claiming during this litigation that she did not know what to do. These contradictory statements and actions at least create a question of fact as to whether Luo acted with reckless disregard for Beverly's rights by failing to properly consider the truth of her statements. *See id.* (refusing to grant summary judgment on defamation claim because "a question of fact exists as to whether defendants displayed a reckless disregard for plaintiff's rights in not conducting a proper investigation into the truth of their statements"); *Muthuswamy v. Burke*, 646 N.E.2d 616, 620, 269 Ill. App. 3d 728, 207 Ill. Dec. 50 (1993) ("Abuse of the privilege occurs if the publisher does not believe in the truth of the defamatory matter or has no grounds for believing it to be true."). The record also creates a question of fact as to whether Luo could have limited the information she conveyed to Global Security, omitting the allegedly

defamatory statement about Beverly's history of lying.  Given the context and Luo's lack of

follow up on any of Global Security's safety recommendations, a reasonable juror could find

Luo's comment about Beverly's history of lying unnecessary for her stated purposes.  *Kuwik*,

619 N.E.2d at 136 (privilege may be abused where party does not appropriately limit the scope

of the material shared).  Because a question of fact exists as to whether Luo acted with actual

malice when reporting to Global Security that Beverly had a history of lying, the Court allows

Beverly's defamation claim to proceed.

## V.     Tortious Interference

Both Beverly and Luo move for summary judgment on Beverly's tortious interference

claim, in which Beverly alleges that Luo intentionally interfered with Beverly's continued

employment with Abbott.  To prove tortious interference, Beverly must show: (1) he had a

reasonable expectation of entering a valid business relationship, (2) Luo knew of that

expectation, (3) Luo purposefully interfered to prevent Beverly's legitimate expectation from

becoming a valid business relationship, and (4) damages resulted from Luo's interference.

*Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048, 403 Ill. App. 3d 549, 342 Ill. Dec. 583

(2010).

Beverly cannot succeed on his tortious interference claim because, as discussed in

connection with his discrimination claims, he cannot establish that he had a reasonable

expectation of continued employment once he began his leave.  The Court acknowledges that

Beverly's status as an at-will employee could suffice to support an expectation of continued

employment.  *See Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878, 142 Ill. 2d 495, 154 Ill.

Dec. 649 (1991) ("[W]here the contract is one for employment, it is immaterial whether it is for a

fixed period or is one which is terminable by either party at will, both parties being willing and

desiring to continue the employment under that contract for an indefinite period." (alteration in original) (citation omitted)).  But once Beverly took his leave, he knew of the fact that Abbott did not guarantee reinstatement from a PLOA and that Luo may need to fill his position while he remained on leave, meaning that any expectation of a continued relationship with Abbott was no longer reasonable.  Instead, once on his PLOA, Beverly merely had a hope of reinstatement, which, without more, does not amount to a reasonable expectancy. *See Williams v. Weaver*, 495 N.E.2d 1147, 1152, 145 Ill. App. 3d 562, 99 Ill. Dec. 412 (1986) (where plaintiff had a fixed term, renewable contract, "the mere hope of continued employment, without more, does not . . . constitute a *reasonable* expectancy"); *see also Werblood v. Columbia Coll.*, 536 N.E.2d 750, 755–56, 180 Ill. App. 3d 967, 129 Ill. Dec. 700 (1989) (plaintiff's expectation that her employment contract would be renewed based on the adoption of draft policy revisions was not sufficient to support a cause of action for intentional interference with prospective economic advantage, even where officials had assured her that her employment was secure); *cf. James v. Intercontinental Hotels Grp. Resources, Inc.*, No. 09-cv-781, 2010 WL 529444, at *4–5 (N.D. Ill. Feb. 10, 2010) (plaintiff sufficiently alleged reasonable expectancy of continued employment to survive motion to dismiss where his allegations were not based on "unfounded expectations, but on an exemplary work record, positive performance evaluations, and previous promotions"). Because Beverly no longer had a reasonable expectation of continued employment with Abbott once he took his PLOA, his tortious interference claim fails.

Additionally, even if Beverly had a reasonable expectation of continued employment with Abbott after taking his PLOA, he has not pointed to evidence in the record from which a reasonable juror could infer that Luo acted maliciously in pursuing his termination.  Luo argues that she could not interfere with Beverly's employment with Abbott because she, at all times,

acted as Abbott's agent. Beverly acknowledges that "Illinois law has recognized a privilege for corporate officers and directors to use their business judgment and discretion on behalf of their corporations," which "applies to situations involving a corporate officer's interference with the corporation's contractual relationship between the corporation and an employee." *Croft v. Inlight Risk Mgmt., Inc.*, No. 01 C 1766, 2002 WL 31010830, at *7 (N.D. Ill. Sept. 9, 2002) (quoting *Chapman v. Crown Glass Corp.*, 557 N.E.2d 256, 263, 197 Ill. App. 3d 995, 145 Ill. Dec. 486 (1990)). But the privilege is qualified and a party can overcome it "if the alleged interference by the corporate officer or director is done 'solely for the person's own gain or is solely for the purpose of harming the plaintiff.'" *Id.* (quoting *Chapman*, 557 N.E.2d at 263).

To overcome the privilege, then, Beverly must demonstrate that Luo acted "intentionally and without justification." *Fellhauer*, 568 N.E.2d at 878. Beverly has failed to do so, however. He argues that Luo acted in her own interest by making representations to Beverly that his job was not in jeopardy while he was on a leave of absence, lulling him into making continued requests to extend his leave, while at the same time seeking to fill Beverly's position almost immediately after he went on leave. Beverly's argument essentially mirrors the one he made with respect to his discrimination claims, arguing that Luo relied on pretextual reasons to justify the termination of his employment with Abbott. *See Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 974 (N.D. Ill. Nov. 14, 2014) (applying same pretext analysis as in discrimination claim to determine whether officer acted maliciously and without justification to overcome qualified privilege). But, as discussed in connection with the discrimination claims, a reasonable juror could not infer from the record that Luo acted without justification or made misrepresentations to Abbott to induce Beverly's termination. *See Shakir v. Bd. of Trs. of Rend Lake Coll.*, No. 08-cv-768-DRH, 2010 WL 538296, at *14 (S.D. Ill. Feb. 8, 2010) (plaintiff could not show corporate

agents acted maliciously or without justification where court found, in relation to discrimination claims, that legitimate and nondiscriminatory reasons existed for the agents' actions). The PLOA policy did not guarantee Beverly a job upon his return from leave, and Beverly understood this to be the case. Beverly's arguments about how Luo acted toward him while he remained on leave do not change this or the fact that, at the time he requested the extension of his leave in July 2015, Abbott had already filled his job and Beverly had not found another job at Abbott in the meantime to allow for reinstatement. Finally, it would strain the imagination to find that Luo's alleged technical violation of the PLOA policy in communicating the last denial of his PLOA extension request first to Beverly and then to the third-party administrator of the leave system suggests an intent to further Luo's personal interests and make her action unjustified. Because Beverly did not have a reasonable expectancy of employment and has not pointed to facts that could overcome Luo's qualified privilege, he cannot succeed on his tortious interference claim.

## VI.     Breach of Contract

Finally, Abbott argues that Beverly's breach of contract claim fails because no covenant of good faith and fair dealing attached to Beverly's at-will employment. But this misstates Illinois law, which, while recognizing an employer's ability to terminate an at-will employee for almost any reason, limits that discretion "by the reasonable expectations of the parties." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir. 2013) (Darrow, J., concurring). "While an at-will employee has no reasonable expectation that he will be discharged only for cause, an employer who discharges an at-will employee under the express terms of the contract can still breach the contract if the employer exercised its discretion in a manner contrary to the reasonable expectations of the parties." *Id.* (citations omitted) (collecting cases). The conflicting concepts

of at-will employment and a covenant of good faith and fair dealing have been reconciled by reasoning that "the covenant of good faith . . . gives way to the rule that an employment at-will contract is terminable for any reason" because the parties' reasonable expectations include the termination of the contract for any reason. *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1444 (7th Cir. 1992) (collecting cases); *Jespersen v. Minn. Mining & Mfg. Co.*, 681 N.E.2d 67, 71, 288 Ill. App. 3d 889, 224 Ill. Dec. 85 (1997) ("[T]he duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will."). This means that Beverly's breach of contract claim fails because, as an at-will employee, he did not have a reasonable expectation of termination only for cause, meaning Abbott did not act in bad faith by terminating his employment.[15] *See Beraha*, 956 F.2d at 1444–45 ("Since Illinois law has consistently held that an employee at-will may be terminated for any reason, an employee at-will has no reasonable expectation that he will be terminated only for cause, and the implied covenant of good faith and fair dealing cannot require the parties to exceed that reasonable expectation. In short, the employment at-will cases do not reject the covenant of good faith and fair dealing. Rather, they hold that the covenant has not been breached where the employer's actions accord with the reasonable expectations of the parties."). And as discussed in connection with his tortious interference claim, once Beverly took his PLOA, he did not have a reasonable

---

[15] In his response, Beverly claims that Abbott acted in bad faith because it terminated him "to prevent him from vesting in the retirement plan he had been working towards faithfully for nearly 9 years." Even treating his claim as one related to Abbott's obligation to pay him retirement benefits, to the extent such a claim would be viable, Beverly has failed to point to any evidence in the record to suggest that Abbott terminated him to prevent the vesting of his retirement benefits. *Cf. Barwin v. Vill. of Oak Park*, No. 14-cv-06046, 2018 WL 4052156, at *4–5 (N.D. Ill. Aug. 24, 2018) (noting that theory that employer breached implied covenant of good faith by terminating plaintiff's employment to prevent him from receiving retirement benefits was "tenuous," but allowing plaintiff to amend complaint to assert such a theory where plaintiff alleged that employer expressed concerns about plaintiff's retirement and ability to collect benefits and then shortly thereafter terminated his employment).

expectancy of continued employment with Abbott, further undermining any bad faith claim. Therefore, the Court grants summary judgment for Abbott on Beverly's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Abbott and Luo's motion for summary judgment [60] and denies Beverly's motion for summary judgment [66]. The Court grants summary judgment for Abbott on those portions of Beverly's IHRA race and age discrimination, § 1981 race discrimination, USERRA discrimination, and IHRA and § 1981 retaliation claims related to his termination (parts of Counts III, IV, V, VI, VII, and IX); and breach of contract claim (Count VIII). The Court grants summary judgment for Luo on Beverly's tortious interference claim (Count XI). Beverly's claims for FMLA interference and retaliation (Counts I and II); IHRA race and age discrimination, § 1981 race discrimination, USERRA discrimination, and IHRA and § 1981 retaliation claims related to the reduction of Beverly's responsibilities (parts of Counts III, IV, V, VI, VII, and IX); and defamation (Count X) remain pending.

Dated: July 10, 2019

_____
SARA L. ELLIS
United States District Judge